## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| | : | |
| | : | **CIVIL ACTION** |
| **BARBARA MCKINNEY,** | : | |
| *Plaintiff,* | : | |
| | : | |
| v. | : | No.    22-4924 |
| | : | |
| **UNITED STATES OF AMERICA,** | : | |
| *Defendant.* | : | |

### MEMORANDUM

**KENNEY, J.**                                                                    **JUNE 10, 2024**

### I.   INTRODUCTION

This is a Federal Tort Claims Act ("FTCA") case against the United States following Plaintiff Barbara McKinney's slip-and-fall outside a United States Post Office. Ms. McKinney alleges that she was injured by the negligence of the United States when it failed to clear the sidewalk leading to the Post Office of snow. The Court held a one-day bench trial on March 26, 2024. Pursuant to Federal Rule of Civil Procedure 52(a), this Opinion sets forth the Court's findings of fact and conclusions of law. For the reasons set forth below, judgment is entered in favor of the United States and against Ms. McKinney.

### II.   FINDINGS OF FACT

#### A.   Parties and Procedural Background

1. Plaintiff Barbara McKinney is 68 years old. ECF No. 36 ¶ 1.

2. The Defendant is the United States of America. *Id.* ¶ 6.

3. This case arises out of a slip-and-fall that took place on December 18, 2020. *Id.* ¶ 8.

4. On February 8, 2021, McKinney timely filed an SF-95 administrative claim with USPS related to the slip-and-fall. *Id.* ¶ 23.

5. That claim requested damages of $750,000 for "injuries to [McKinney's] cervical spine, lumbar spine, and knees." Trial Exhibit ("Ex.") 16 at 1.

6. The administrative claim was denied on January 13, 2023. Ex. 15 at 1-2.

7. On December 12, 2022, McKinney filed the instant action against the United States, Verizon Pennsylvania, Inc., and Verizon Communications. ECF No. 1.

8. On May 5, 2023, all parties stipulated to dismiss Verizon Pennsylvania, Inc. and Verizon Communications from the case. ECF No. 25.

**B. Factual Background**

9. McKinney maintained a Post Office Box in the Ardmore Post Office (the "Post Office"), located at 30 Ardmore Avenue, Ardmore, PA 19003. ECF No. 36 ¶¶ 2, 4.

10. The United States Postal Service ("USPS") owns and operates the Post Office and is responsible for snow removal on the stairs and sidewalk outside the Post Office. *Id.* ¶ 11.

11. Some snow had fallen in Ardmore in the days preceding December 18, 2020. ECF No. 51 at 13:15-25.

12. On December 18, 2020, McKinney drove to the Ardmore Post Office. *Id.* at 12:23-13:6.

13. She intended to purchase a money order at the Post Office. *Id.* at 13:5-6.

14. McKinney arrived at the Post Office at approximately 4:30 P.M., but no later than 5:00 P.M. ECF No. 36 ¶ 8; ECF No. 51 at 13:10-12.

15. McKinney parked her car directly in front of the Post Office. ECF No. 36 ¶ 12.

16. To get from her car to the Post Office, she would need to exit into the street, step up onto the curb, walk on the sidewalk, and walk up the steps. *Id.*

17. The steps up to the Post Office had been cleared of snow. ECF No 51 at 22:21-25.

18. There was a strip of snow approximately two feet wide that went all along the perimeter of the sidewalk surrounding the Post Office. *Id.* at 13:15-14:1; 19:17-20:11; 47:8-48:8.

19. Aside from that two-foot-wide strip of snow, the sidewalk was meaningfully clear of snow. *Id.* at 22:21-25.

20. McKinney observed the extent of the snow and determined that there was no way to enter the Post Office without crossing the snow. *Id.* at 48:15-19.

21. McKinney determined that even if she parked in the handicapped parking spot on the side of the Post Office, she still would have had to cross the snow on the sidewalk. *Id.* at 48:15-24.

22. After parking her car in front of the Post Office, McKinney exited her car. *Id.* at 43:17-20.

23. While attempting to walk to the Post Office, McKinney slipped on the strip of snow on the sidewalk, and fell on the ground. *Id.* at 12:23-13:9.

24. McKinney testified at trial that she fell backwards. *Id.* at 21:3-10.

25. Contemporaneous doctor's notes reflect that McKinney told Erin Haberman, CRNP, on January 27, 2021 that she fell forwards. *Id.* at 58:17-59:4.

26. An unidentified individual helped McKinney get up from the ground. McKinney does not know this individual's name. *Id.* at 20:18-21:21.

3

27. McKinney then walked across the sidewalk, up the steps, and into the Post Office of her own accord. *Id.* at 23:3-8.

28. Once she arrived inside the Post Office, McKinney informed one of USPS employees that she had fallen on the snow in front of the Post Office. *Id.* at 23:13-20.

29. That employee informed her manager, Colette Harley, of McKinney's fall. *Id.* at 24:3-10.

30. At the time of the incident, Harley was the Acting Supervisor at the Post Office. Ex. 40 at 11:18-12:1.

31. Harley was an Acting Supervisor at the Ardmore Post Office from August 3, 2020 through 2023. *Id.* at 9:24-10:15.

32. Harley worked for USPS as a city carrier from 2006-2020. *Id.* at 11:3-15.

33. Harley testified that her recollection as to the incident on December 18, 2020 was "somewhat" or "vaguely clear." *Id.* at 36:14-37:2

34. Harley testified that she did not take pictures of the street, and she was not aware of anyone at the Post Office taking pictures. *Id.* at 13:14-17.

35. Harley testified that the Post Office contracts with a snow removal company and that the Post Office policy is to call them if there is more than one inch of snow on the ground. *Id.* at 14:15-20.

36. Harley testified that the contractor had cleared snow in the vicinity of the Post Office but did not know precisely which day they had performed their work. *Id.* at 15:4-8.

37. Harley asked McKinney if she needed any assistance, wanted to file a report, or wanted to call any emergency services. McKinney responded in the negative to all questions. *Id.* at 12:11-20; ECF No. 51 at 50:7-17.

38. Harley did not create a report regarding McKinney's fall. *Id.* at 18:8-9.

39. At the Post Office, McKinney successfully purchased a money order and some stamps. ECF No. 51 at 24:15-22.

40. Once McKinney had completed her transaction at the Post Office, Harley accompanied her to her car, although without assisting McKinney in walking in any way. *Id.* at 25:2-10; Ex. 40 at 12:21-24.

41. After the incident, McKinney drove herself home. ECF No. 51 at 25:18-19.

42. After her December 18, 2020 fall, McKinney did not see any medical professionals until January 6, 2021. *Id.* at 51:1-10.

43. McKinney's January 6, 2021 appointment was with Relievus and was a routine follow-up visit. *Id.* at 51:20-52:2.

44. Relievus was a pain management facility that provided controlled substances to McKinney for pain management. *Id.* at 29:3-10.

45. McKinney had been a patient at Relievus prior to the December 2020 incident. *Id.* at 74:19-21.

46. At the January 6, 2021 visit, McKinney described the fall to her medical provider at Relievus, who counseled McKinney to rest and ice her knees. *Id.* at 53:25-54:16.

47. In January 2021, a paralegal at Lowenthal and Abrams (McKinney's retained law firm in the instant case) had referred McKinney to a Dr. Nelson. *Id.* at 55:3-15.

48. McKinney spoke with Dr. Nelson by phone, and he referred her to Ardmore Pain Management. *Id.* at 54:17-24.

49. McKinney had her first visit at Ardmore Pain Management on January 27, 2021, where she saw Erin Haberman, a Certified Registered Nurse Practitioner. *Id.* at 57:21-58:10.

50. McKinney saw Dr. Stacey Lendener at Ardmore Pain Management on July 26, 2021 and October 13, 2021. Exs. 31, 32.

**C. McKinney's Pre-Incident Medical History**

51. In 1993, a ceiling tile fell on McKinney's head, for which she required a L5-S1 laminectomy. ECF No. 51 at 74:1-4.

52. In approximately 2008-09, McKinney suffered a lower back and left knee injury at work, for which she had another laminectomy surgery and was not able to return to her position. *Id.* at 63:3-7; 27:20-25; ECF No. 36 ¶ 28.

53. She received worker's compensation for her work injury. ECF No. 36 ¶ 28.

54. In 2011, McKinney sustained a motor vehicle accident when she was hit by an ambulance and suffered neck injuries, and she required a surgery that inserted a titanium plate into her neck. *Id.* ¶ 31; ECF No. 51 at 28:3-10.

55. In June 2013, McKinney was hospitalized for a microscopic C3 to C4 anterior cervical diskectomy and fusion. Ex. 34 at 1; ECF No. 51 at 135:14-20.

56. In 2014, McKinney suffered another motor vehicle accident when a U-Haul truck ran into her, which caused cervicalgia, clinical cervical radiculopathy, cervical spine stenosis, SP cervical fusion surgery, post-traumatic lumbago, post-traumatic lumbar facet syndrome, disc herniation at L4-5, L5-S1, lumbar radiculopathy at

bilateral L5-S1, post-traumatic muscle spasms, pain in both knees due to degenerative joint disease, and chronic pain syndrome due to trauma. ECF No. 51 at 67:5-68:15.

57.     In late 2015, McKinney received two lumbar epidural steroidal injections at L4-5 #2 to treat back pain. Ex. 38 at 1-2.

58.     In June 2018, McKinney was hospitalized due to regular episodes of lightheadedness, total body shaking, and headaches, one of which resulted in her falling down the steps in her house and losing consciousness. ECF No. 51 at 71:8-72:21.

59.     In March 2020, McKinney was admitted to the hospital when she was found by EMS wedged in between her nightstand and bed, non-responsive. When she regained consciousness, she reported headaches. *Id.* at 69:7-22.

60.     McKinney has regularly been prescribed and taking opioids since her 1993 accident. *Id.* at 70:7-9.

61.     Prior to January 6, 2021, McKinney was prescribed – and was regularly taking – the following medications: Norco, MS Contin, Trazodone, Baclofen, Celebrex, Pennsaid, Gabapentin, Lidoderm, Benicar, Clonidine, Metformin, Aspirin, and Vicodin. Ex. 20 at 3; ECF No. 51 at 75:7-76:4.

**D.  Medical Testimony**

   **i.  Dr. Lefkoe's Testimony**

62.     Dr. Thomas Lefkoe is a physician with approximately 54 years of experience. Ex. 8; ECF No. 51 at 122:20-123:7.

63.     Dr. Lefkoe is licensed to practice medicine in the state of Pennsylvania. ECF No.

        51 at 123:8-10.

64.     Dr. Lefkoe is board certified in orthopedic surgery. *Id.* at 123:11-12.

65.     Dr. Lefkoe practiced as an orthopedic surgeon for approximately 40 years, and

        treated patients for neck, back, and knee injuries, including patients involved in

        slip and fall accidents. *Id.* at 123:21-124:15.

66.     As part of his practice, Dr. Lefkoe regularly reads MRI reports of his patients,

        including MRI reports of cervical spines, lumbar spines, shoulders, and knees. *Id.*

        at 124:16-125:5.

67.     In preparation for this case, Dr. Lefkoe reviewed diagnostic studies of McKinney,

        including the following:

        a.   a March 2010 CT scan of her lumbar spine,

        b.   a 2010 x-ray of her lumbosacral spine,

        c.   a January 2011 x-ray of her left foot,

        d.   a June 2011 x-ray of her cervical spine,

        e.   a June 2011 x-ray of her left knee,

        f.   a March 2013 MRI of her lumbar spine,

        g.   a June 2013 fluoroscopy of her cervical spine,

        h.   a February 2014 MRI of her lumbar spine,

        i.   a February 2014 MRI of her cervical spine,

        j.    a February 2014 x-ray of her cervical spine,

        k.   a February 2014 x-ray of her left knee,

        l.   a June 2015 MRI of her lumbar spine,

     m.  a June 2015 MRI of her cervical spine,

     n.  October 2015 electrodiagnostic studies of her lumbar spine,

     o.  a November 2015 x-ray of her bilateral knees,

     p.  a December 2015 x-ray of her left knee,

     q.  November 2016 x-rays of her knees,

     r.  a March 2020 CT scan of her thoracic spine,

     s.  a March 2020 CT scan of her cervical spine, and lumbar spine,

     t.  March 2020 CAT scans of her chest, abdomen, pelvis, head, cervical spine, lumbar spine, and thoracic spine,

     u.  April 2021 x-rays of McKinney's knees, cervical spine and lumbar spine,

     v.  an April 2021 x-ray of her bilateral knees,

     w.  a May 2021 MRI of McKinney's cervical spine,

     x.  a May 2021 MRI of her lumbar spine, and

     y.  a May 2021 MRI of her cervical spine. Ex. 9 at 5-13.

68.    In addition, Dr. Lefkoe reviewed over 5,000 pages of McKinney's medical records, including records relating to the following:

     a.  an anterior cervical discectomy and fusion at C3-4 in June 2013,

     b.  a medical report from May 2015 relating to her February 2014 motor vehicle accident,

     c.  chiropractic care between May and October 2015,

     d.  Relievus records from January through October 2021,

     e.  chiropractic records from Ardmore Pain Management Center,

     f.  lumbar epidural steroid injections in November and December 2015, and

g.  emergency room admissions in June 2018, March 2022, and May 2022. Ex. 9 at 6-13; *see also* ECF No. 51 at 126:10-12.

69.  Dr. Lefkoe examined McKinney in September 2023 for approximately 45 minutes. Ex. 9 at 3-5; ECF No. 51 at 127:22-128:6.

70.  In his examination, Dr. Lefkoe determined that McKinney's right shoulder exhibited marked weakness, and her cervical spine, lumbosacral spin, and both knees had severe limitation of motion. ECF No. 51 at 131:1-133:23.

71.  Dr. Lefkoe also determined that McKinney had arthritis in both knees. *Id.* at 133:5-23.

72.  Dr. Lefkoe testified that McKinney's impairments did not relate to her December 2020 fall in front of the Post Office. *Id.* at 133:24-134:8.

73.  Dr. Lefkoe testified that McKinney's June 2013 surgery contributed to limited range of motion in her neck. *Id.* at 135:11-23.

74.  Dr. Lefkoe testified that McKinney was treated for pain management following her 2014 car accident, which left her with reduced range of motion in her cervical and lumbar spine. *Id.* at 137:8-138:17.

75.  Dr. Lefkoe testified that McKinney underwent an electrodiagnostic consultation which determined that her 2014 car accident directly caused moderate L5 radiculopathy and moderate S1 radiculopathy. *Id.* at 139:3-23.

76.  Dr. Lefkoe testified that McKinney was admitted to Presbyterian Hospital in June 2018 when complaining of headaches and shakes, which were caused in part by her medications. *Id.* at 140:22-142:1.

77.     Dr. Lefkoe testified that McKinney did not present any new symptoms after the December 18, 2020 slip and fall that she did not have prior to the fall. *Id.* at 147:4-9.

78.     Dr. Lefkoe testified that x-rays of McKinney's lumbar taken in April 2021 show degenerative damage that did not result from the December 2020 fall. *Id.* at 147:16-148:9.

79.     Dr. Lefkoe testified that x-rays of McKinney's knees taken in April 2021 showed a progression of arthritis that did not result from the December 2020 fall. *Id.* at 148:10-149:10.

80.     Dr. Lefkoe testified that comparing MRIs taken of McKinney's lumbar and cervical spine showed only degenerative disease, with no evidence of acute trauma resulting from her December 2020 fall. *Id.* at 149:11-151:7.

81.     Dr. Lefkoe did not agree with Dr. Lendener's diagnosis of aggravation of existing neck and low back pain, since McKinney had had those conditions prior to her fall. *Id.* at 152:4-18.

82.     Dr. Lefkoe testified that McKinney began treatment for headaches after her 2014 car accident. *Id.* at 152:22-153:22.

83.     Dr. Lefkoe testified that McKinney's February 2022 hospital admission for generalized pain, dehydration, and acute kidney injury did not result from her December 2020 fall. *Id.* at 154:4-18.

84.     Dr. Lefkoe testified that McKinney's May 2022 emergency room visit was for treatment of a thigh infection that was unrelated to her December 2020 fall. *Id.* at 154:22-155:15.

85.     Dr. Lefkoe testified that he diagnosed McKinney with eleven conditions: 1) cervical sprain and strain, 2) multi-level cervical degenerative disc disease, 3) post C3-4 anterior cervical fusion, 4) lumbar sprain and strain, 5) lumbar degenerative disc disease with vacuum disc phenomenon L4-5 and L5-S1, 6) advanced degenerative disc disease at L5-S1 with severe bilateral foraminal stenosis probably impinging on exiting L5 nerve roots, 7) post-low back surgery, 8) tri-compartmental arthritis in both knees, 9) post-surgical arthroscopy, 10) deep wound infection in right lateral hip and thigh, and 11) chronic opioid dependence. *Id.* at 155:16-156:12.

86.     Dr. Lefkoe testified that of these 11 diagnoses, only lumbar and cervical sprain and strain could be attributed to McKinney's December 2020 fall. *Id.* at 156:13-25.

87.     Dr. Lefkoe testified that none of the other nine diagnoses were caused or aggravated by McKinney's December 2020 fall. *Id.* at 155:20-156:12.

**ii.     Dr. Lendener Testimony**

88.     Dr. Stacey Lendener is a physician with approximately 21 years of experience. Ex. 7 at 9:19-10:16.

89.     Dr. Lendener is licensed to practice medicine in the state of Pennsylvania. *Id.* at 11:15-20.

90.     She is board certified in physical medicine and rehabilitation and pain medicine. *Id.* at 12:1-5.

91.     She is employed at Ardmore Pain Management. *Id.* at 18:10-12.

92.     Dr. Lendener first examined McKinney on July 26, 2021. *Id.* at 19:17-18.

93.     In the course of the July 26, 2021 examination, McKinney orally related her medical history to Dr. Lendener, and Dr. Lendener reviewed a May 2021 MRI of McKinney's cervical spine. *Id.* at 20:4-22:6.

94.     Dr. Lendener reviewed April 2021 x-rays of McKinney's knees. Ex. 6 at 1.

95.     Aside from the May 2021 MRI and the April 2021 knee x-rays, Dr. Lendener did not review any other diagnostic studies or medical records of McKinney. Ex. 7 at 37:3-15.

96.     After her July 2021 examination, Dr. Lendener concluded that McKinney had 1) aggravation of existing neck pain, 2) aggravation of existing low back pain, 3) cervical sprain and strain, 4) lumbosacral sprain and strain, 5) bilateral knee pain and 6) post-traumatic headaches. Ex. 31 at 1.

97.     After the July 2021 examination, Dr. Lendener recommended that McKinney continue with physical therapy and continue her existing pain treatments. *Id.* at 1-2.

98.     Dr. Lendener next examined McKinney on October 13, 2021. Ex. 7 at 35:9-36:16.

99.     After examining McKinney in October 2021, Dr. Lendener concluded that McKinney's final diagnoses were: 1) cervical radiculitis, 2) lumbar radiculutis, 3) cervical sprain and strain, 4) lumbar sprain and strains, 5) aggravation of pre-existing chronic neck pain, 6) aggravation of pre-existing chronic low back pain, 7) bilateral knee pain, and 8) post-traumatic headaches. Ex. 32 at 1.

100.    After the October 2021 visit, Dr. Lendener concluded that McKinney had exhibited maximum medical improvement, such that she would not be able

provide any additional treatments that would significantly change McKinney's symptoms. Ex. 7 at 31:19-32:5.

101.  Dr. Lendener was not specifically aware of any injuries McKinney sustained from the ceiling tile falling on her in 1993. *Id.* at 43:19-23.

102.  Dr. Lendener was not specifically aware of McKinney's work-related injury that occurred in 2008. *Id.* at 43:14-18.

103.  Dr. Lendener was not specifically aware of McKinney's motor vehicle accidents in 2011 and 2014 or any injuries she suffered from them. *Id.* at 43:24-44:4.

104.  Dr. Lendener was not specifically aware of whether McKinney had previously suffered headaches of any kind prior to December 2020. *Id.* at 40:5-41:15; 50:16-18.

105.  Dr. Lendener was generally aware that McKinney had had previous lumbar and cervical spine injuries. *Id.* at 42:13-24.

106.  Dr. Lendener testified that the December 2020 fall did not cause McKinney's spondylosis. *Id.* at 45:15-17.

107.  Dr. Lendener testified that the December 2020 fall did not cause McKinney's osteoarthritis in both knees. *Id.* at 46:8-21.

108.  Dr. Lendener testified that the December 2020 fall did not cause McKinney's degenerative disc disease. *Id.* at 51:24-54:4.

109.  Dr. Lendener could not say with a reasonable degree of medical certainty that McKinney's disc injuries were worsened by her December 2020 fall. *Id.* at 54:12-55:6.

110.    Dr. Lendener could not compare McKinney's range of motion in her cervical and lumbar spine at her examination to McKinney's range of motion in those areas just before December 18, 2020. *Id.* at 71:10-24.

## III.    CONCLUSIONS OF LAW

### A.  Applicable FTCA Law

"The United States, as sovereign, is immune from suit save as it consents to be sued, and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Sherwood*, 312 U.S. 584, 586-87 (1941) (internal citations omitted). "A waiver of sovereign immunity ... must be unequivocally expressed." *United States v. Mitchell*, 445 U.S. 535, 538, (1980) (internal quotations omitted). The Federal Tort Claims Act ("FTCA") is the exclusive waiver of sovereign immunity for tort claims against the United States for money damages "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 1346(b)(1); *United States v. Olson*, 546 U.S. 43, 44 (2005). Because the FTCA provides a limited waiver of the United States' sovereign immunity, its established procedures must be strictly construed. *See White-Squire v. U.S. Postal Serv.*, 592 F.3d 453, 456 (3d Cir. 2010); *Livera v. First Nat'l State Bank of N.J.*, 879 F.2d 1186, 1194 (3d Cir. 1989).

An FTCA action may not be instituted unless the claimant first presents the claim to the appropriate Federal agency seeking a sum certain. *See* 28 U.S.C. §§ 2675(a)-(b). The exhaustion and sum certain requirements in § 2675(a) are "jurisdictional and cannot be waived." *Shelton v. Bledsoe*, 775 F.3d 554, 569 (3d Cir. 2015); *see also White-Squire*, 592 F.3d at 457.

### B.  Pennsylvania Negligence Law

Under Pennsylvania law, a cause of action for negligence requires that the plaintiff prove: (1) duty; (2) breach; (3) causation; and (4) damages. *See Est. of Zimmerman v. Se. Pennsylvania Transp. Auth.*, 168 F.3d 680, 684 (3d Cir. 1999) (citing *Est. of Swift v. Ne. Hosp. of Phila.*, 690 A.2d 719, 722 (Pa. Super. Ct. 1997)).

To establish the causation element, the plaintiff must show that the defendant's breach was both the proximate and actual cause of injury. *See Roessing v. United States,* No. 3:19-cv-161, 2021 WL 1663590, at *5 (W.D. Pa. Apr. 28, 2021) (citing *Reilly v. Tiergarten Inc.*, 633 A.2d 208, 210 (Pa. Super. Ct. 1993)). "Actual causation is present when the alleged injury would not have occurred but for a certain act or presence of a condition . . . while proximate causation requires that the defendant's wrongful act be a substantial factor in bringing about the plaintiff's harm." *Id.* (internal quotations omitted). A plaintiff must make this showing by a preponderance of the evidence. *See Brown v. United States*, No. 3:07-0621, 2008 WL 2704615, at *7 (M.D. Pa. July 7, 2008). "In most circumstances, a plaintiff must prove causation by expert medical testimony." *Schweikert v. Eagle*, No. 20-4310, 2022 WL 394751, at *3 (E.D. Pa. Feb. 9, 2022) (citing *Lattanze v. Silverstrini*, 448 A.2d 605, 608 (Pa. Super. Ct. 1982)). The "mere occurrence of an injury does not prove negligence." *Hamil v. Bashline*, 392 A.2d 1280, 1284 (Pa. 1978). The fact that a plaintiff is particularly susceptible to injury does not limit a defendant's liability "because negligence causing aggravation of a pre-existing condition subjects a tortfeasor to the same degree of liability as the infliction of an original wound." *Brown*, 2008 WL 2704615, at *8 (citing *Fretts v. Pavetti*, 422 A.2d 881, 885 (Pa. Super. Ct. 1980)).

"To prove damages, a plaintiff must give a factfinder evidence from which damages may be calculated to a reasonable certainty." *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225-26 (3d Cir. 2003) (internal quotations omitted). Recoverable damages under Pennsylvania law may be

16

economic (lost wages, loss of future earning capacity, and medical expenses) and non-economic (pain and suffering, past, present and future mental anguish, loss of enjoyment of life, and disfigurement). *See Durosky v. United States*, No. 07-cv-1828, 2008 WL 5104850, at *5, *9 (M.D. Pa. Dec. 1, 2008). Past medical expenses must be reasonable and the services necessary and related to the injuries for which recovery was sought. *See Martin v. Soblotney*, 466 A.2d 1022, 1024 (Pa. 1983). Per Pennsylvania's comparative negligence statute, "any damages sustained by the plaintiff shall be diminished in proportion to the amount of negligence attributed to the plaintiff." 42 Pa. C.S.A. § 7102(a).

### C. Pennsylvania Business Invitee Law

A landowner owes the highest duty of care to a business invitee. *Falcone v. Speedway LLC*, No. 14-cv-2188, 2017 WL 220326, at *2 (E.D. Pa. Jan. 19, 2017) (citing *Truax v. Roulhac*, 126 A.3d 991, 997 (Pa. Super. Ct. 2015)). A business invitee is a "person who is invited to enter or remain on land for a purpose directly or indirectly connected with the business dealings with the possessor of the land." *Id.* (quoting *Charlie v. Erie Ins. Exch.*, 100 A.3d 244, 253 (Pa. Super. Ct. 2014)). A customer is a business invitee. *Pace v. Wal-Mart Stores East, LP*, 337 F. Supp. 3d 513, 518 (E.D. Pa. 2018), aff'd 799 F. App'x 127 (3d Cir. 2020).

"A possessor of land is subject to liability for physical harm caused to his invitee by a condition on the land if, but only if, he (a) knows or by the exercise of reasonable care would discover the condition and should realize that it involves an unreasonable risk of harm to such invitees, and (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and (c) fails to exercise reasonable care to protect them against the danger." *King v. Rocktenn CP, LLC*, 643 F. App'x 180, 182 (3d Cir. 2016) (quoting *Atkins v. Urban Redevelopment Auth. Of Pittsburgh*, 414 A.2d 100, 103-04 (Pa. 1980)).

Although a possessor of land has a duty to protect a business invitee from foreseeable harm, that duty is not absolute. A possessor of land owes no duty to a plaintiff if the plaintiff "discover[ed] dangerous conditions which [were] both obvious and avoidable, and nevertheless proceed[ed] voluntarily to encounter them." *Carrender v. Fitterer*, 469 A.2d 120, 125 (Pa. 1983). "Under the doctrine of assumption of the risk, a defendant is relieved of its duty to protect a plaintiff where the plaintiff has voluntarily and deliberately proceeded to face a known and obvious risk and therefore is considered to have assumed liability for his own injuries." *Barrett v. Fredavid Builders, Inc.*, 685 A.2d 129, 130 (Pa. Super. Ct. 1996); *see* Restatement (Second) of Torts § 343A; *Carrender*, 469 A.2d at 125.

A danger is "obvious" when "both the condition and the risk are apparent to and would be recognized by a reasonable man, in the position of the visitor, exercising normal perception, intelligence, and judgment." *Carrender*, 469 A.2d at 123 (citation omitted). For a danger to be "known," it must "not only be known to exist" but also "recognized that it is dangerous and the probability and gravity of the threatened harm must be appreciated." *Id.* at 124 (citation omitted). Thus, the assumption of risk doctrine "must be examined when determining whether the defendant owed plaintiff a duty." *Roessing*, 2021 WL 1663590, at *6 (citing *Kaplan v. Exxon Corp.*, 126 F.3d 221, 224–25 (3d Cir. 1997)). Assumption of the risk is a question for the jury "unless reasonable minds could not disagree." *Kaplan*, 126 F.3d at 225 (citing *Carrender*, 469 A.2d at 124).

### D.  Application of Law to Facts

This is a negligence action brought against the United States pursuant to the FTCA. This Court has jurisdiction over the subject matter and the parties to this action pursuant to 28 U.S.C. § 1346(b)(1). The event at issue here, the slip-and-fall on December 18, 2020, occurred in Ardmore,

PA. Accordingly, venue is proper in this district, *see* 28 U.S.C. § 1391(b)(2), and the substantive law of Pennsylvania governs. *Barnes v. United States*, 685 F.2d 66, 68 (3d Cir. 1982).

The parties dispute each element of a negligence claim. First, whether USPS owed a duty to McKinney; second, whether USPS breached that duty, third, whether McKinney's injuries were the actual and proximate cause of the breach; and fourth, damages.

### a. Duty and Breach

McKinney established by a preponderance of the evidence that USPS owed her a duty. It is undisputed that as a USPS customer, McKinney was a business invitee and entitled to the highest duty of care. It is further undisputed that USPS is responsible for protecting McKinney from unreasonable risks, such as snow, that appear on the Post Office-side of the sidewalk next to Ardmore Avenue.

In the first instance, McKinney's firsthand testimony is sufficient to establish that there was snow on the sidewalk that provided no clear path for her to walk from her car into the Post Office. McKinney testified lucidly that an approximately two-foot perimeter of snow stretched all around the Ardmore Post Office, such that there was no way for her to enter the Post Office without walking on snow. She specifically testified that there was snow covering the sidewalk next to the handicapped parking spot by the Post Office.

USPS' only rebuttal to that evidence came from Colette Harley, a supervisor at USPS. Harley stated that her recollection of the incident on December 18, 2020 was only "somewhat" or "vaguely clear." Ex. 40 at 36:14-37:2. Harley testified that there was not snow on the sidewalk, but there was snow in the "curb area." *Id.* at 13:8-13. Harley's testimony is in accordance with her stated memory of the event; she testified that there was no snow on the sidewalk at all, which is not credible testimony, given that the snow removal contractor must have put the snow on some

part of the sidewalk, and that it had snowed recently. Her description of where the snow fell on the "curb area" was also vague and insufficiently clear to rebut McKinney's firsthand testimony. Nor did Harley firmly state that a clear path was created such that McKinney could walk from the street to the Post Office unimpeded. Further, Harley only testified as to the general procedures that would have been followed when she called the snow removal contractor but did not have a specific recollection of the specific snow removal that occurred on December 18, 2020. Despite McKinney's verbal report to Harley that she had fallen on snow outside the Post Office, Harley did not file a written report or take photographs of the sidewalk. Harley was in the best position to investigate the incident on behalf of USPS. If there were truly a clear path to the Post Office on the sidewalk, taking a picture would provide Harley with an exceedingly easy way to refute McKinney's claim. That she took no such action bolsters McKinney's position.

USPS did not support Harley's imprecise testimony with evidence from any other Post Office employees or guests as to the presence of snow on the ground, nor did it provide testimony from any of the snow removal contractor's employees as to their standard practices or work on that particular day.

USPS asserts that even if there were snow on the sidewalk, McKinney assumed the risk of walking on the snow, thereby relieving USPS of their duty. However, even if an invitee is aware of the dangerous condition, the defendant still retains the duty if the invitee had "no safe alternative to encountering the risk." *Kaplan.*, 126 F.3d at 226. Courts in Pennsylvania have found that plaintiffs had no safe alternative to waking on dangerous conditions such as snow, ice, or water where they found themselves with no other way to pass the condition. For example, the plaintiff in *Gilchrist v. Wal-Mart Stores East, LP*, No. 14-cv-2154, 2015 WL 619641, at *3 (E.D. Pa. Feb. 12, 2015) slipped on the floor of a Wal-Mart that she knew was wet, but only because she had no

other way to exit the store. The same is true where the ice or snow covers the pathway to one's residence. *See Lewis v. First Montgomery Grp.,* No. 08-cv-2197, 2010 WL 3210419, at *6 (D.N.J. Aug. 11, 2010) (no safe alternative where plaintiff slipped on snow and ice covering all available parking spaces at her apartment complex). Since McKinney's testimony established that an approximately two-foot perimeter of snow on the sidewalk encircled the Post Office, she had no safe alternative to entering the Post Office other than walking on the snow. It is theoretically possible that since McKinney did not need to go to the Post Office on an emergency basis, she could have simply gotten back into her car when she realized that snow covered the entryway to the Post Office and that she would be unable to pass without walking on snow. However, it is not proper for the Post Office to maintain a moat around itself that gives invitees the choice between risking a walk on the snow and refraining from using a public service. Accordingly, McKinney established by a preponderance of the evidence that USPS breached their duty to her by failing to create a clear pathway for her to walk to the Post Office, which created an unreasonable risk of harm to her.

### b. Causation

McKinney has not established by a preponderance of the evidence that all of her injuries were caused by the December 18, 2020 incident. However, she has established by a preponderance of the evidence that her lumbar and cervical sprain and strain were caused by the December 18, 2020 incident.

The "existence of a causal relationship between the injury complained of and the alleged negligent act to be entitled to recover for the injury" must be supported by expert medical testimony unless there is an "obvious causal relationship between the injury and the alleged negligent act." *Schweikert*, 2022 WL 394751, at *3 (citing *Lattanze*, 448 A.2d at 608).

Experts who are specifically retained to provide expert testimony must provide expert reports. *Schweikert*, 2022 WL 394751, at *4. A treating physician who does not submit an expert report can only testify as to their opinions that are formed "as part of the ordinary care of a patient." *Id.* (citing *Pease v. Lycoming Engines*, No. 10-cv-843, 2012 WL 162551, at *13 (M.D. Pa. Jan. 19, 2012)). When a medical expert testifies as to causation, they must testify that "the result in question actually came from the cause alleged. "It is not enough to say that the alleged cause 'possibly', or 'could have' led to the result, that it 'could very properly account' for the result, or even that it was 'very highly probable' that it caused the result." *Albert v. Alter*, 381 A.2d 459, 470 (Pa. Super. Ct. 1977) (collecting cases).

Dr. Lendener did not provide an expert report in this action, so her testimony is limited to what she derived in her treatment of the patient. Her opinions in this case stem solely from her two examinations of McKinney in July and October 2021. Dr. Lendener ultimately provided eight diagnoses of McKinney in her Final Evaluation Note, dated October 13, 2021. Ex. 32. However, Dr. Lendener failed to causally link most of McKinney's diagnoses to her December 2020 fall. Dr. Lendener first examined McKinney in July 2021, eight months after her fall. As clearly stated in her testimony, Dr. Lendener did not review any MRIs, x-rays, or paper medical records of McKinney's prior to her fall. Therefore, she had no way to ascertain whether her diagnoses of McKinney were present prior to the December 2020 fall. Indeed, she admits that several of her diagnoses were long-term, chronic conditions rather than acute injuries that would have been caused by a fall. In her July 2021 treatment note, she wrote that McKinney's "neck, low back, and bilateral knee pain…were present previously." Ex. 31 at 1. Dr. Lendener wrote in her October 2021 final evaluation note that "it is possible that the patient's disc injuries were worsened or advanced as a result of the fall." Ex. 32 at 2. Aside from the fact that Dr. Lendener's equivocal

language as to this condition is insufficiently definite, her analysis describes an injury that is, at most, an exacerbation of a pre-existing chronic condition. Moreover, Dr. Lendener conceded in her trial testimony that she had no way of knowing whether McKinney's disc protrusions worsened after her fall and could not provide a conclusion with a reasonable degree of medical certainty. *See supra* ¶ 111.

Dr. Lendener's diagnoses of lumbar and cervical radiculitis appear in her October 2021 evaluation note, but not her July 2021 evaluation note. Dr. Lendener claims that these are akin to flareups that were present in October 2021, but not July 2021. Here too, Dr. Lendener's failure to review McKinney's prior medical records undermines her causation claim. Radiculopathy is a diagnosis of nerve damage based on documented EMG testing, whereas radiculitis is a patient's subjective report of pain that may result from radiculopathy. McKinney had been diagnosed with radiculopathy since at least 2014. According to Dr. Lendener's treatment notes, McKinney's radiculitis presented in her October 2021 visit (but not her July 2021 visit). However, Dr. Lendener had not reviewed diagnostic studies or medical records pertaining to McKinney's prior radiculopathy diagnosis, so she had no objective basis to assess whether McKinney's October 2021 presentation of radiculitis was worse than flareups she had had prior to the December 2020 fall.

Dr. Lendener's diagnoses of aggravation of pre-existing neck pain, knee pain, and low-back pain are not sufficiently supported either. Dr. Lendener conceded in her trial testimony that McKinney had pre-existing pain in her neck, low-back, and knees. However, without reviewing any of McKinney's records or diagnostic studies prior to her to 2020 fall, Dr. Lendener had no objective basis to compare McKinney's pain to her condition prior to the fall. Without any idea of McKinney's condition prior to the fall, Dr. Lendener would be unable to articulate any basis for concluding that McKinney's condition had worsened as a result of the fall.

The same is true of McKinney's post-traumatic headaches. Dr. Lendener diagnosed McKinney with post-traumatic headaches in July 2021 and October 2021 after the December 2020 fall. In her trial testimony, Dr. Lendener asserts that post-traumatic headaches differ from typical headaches or migraines. Yet without an examination of McKinney or her records prior to the December 2020 fall, Dr. Lendener has no way to tell whether the post-traumatic headaches stemmed from any cause that pre-dated December 2020. Indeed, Dr. Lendener was not specifically aware that McKinney had suffered headaches of any kind prior to December 2020, even as the medical evidence shows that McKinney first began to experience headaches after her motor vehicle accident in 2014, and reported headaches as recently as her March 2020 hospitalization. Moreover, McKinney provided conflicting descriptions of her fall, telling her medical provider in 2021 that she fell forward onto her knees, but testifying at trial that she fell backward, hitting her head. McKinney had been treated for headaches since 2014, and Dr. Lendener did not diagnose her with migraines, despite McKinney's testimony that she suffered migraines as a result of her fall.

Dr. Lendener's conclusion that "it is possible" that McKinney's disc injuries were worsened as a result of the December 2020 fall is, as a matter of law, too uncertain to meet the threshold that she must meet to prove causation for that condition. Ex. 32 at 2.

Thus, of Lendener's eight final diagnoses, six are unsupported by the opinions formed in her treatment of McKinney and are not causally linked to the December 2020 fall.

By contrast, Dr. Lefkoe testified that virtually all of his diagnoses of McKinney were either unrelated to or pre-dated her December 2020 fall. He came to these conclusions after reviewing a voluminous quantity of McKinney's medical records and diagnostic studies dating back to 2010. Viewing the full set of records enabled Dr. Lefkoe to determine that the December 2020 fall was

not the cause of the vast majority of McKinney's injuries and that the injuries either pre-dated or were unrelated to her fall. He also concluded that his analysis of the records before and after the fall did not show that the December 2020 fall had caused aggravation of the injuries.

Dr. Lefkoe's analysis of the records showed that many of McKinney's injuries stemmed from injuries other than her 2020 fall. For example, McKinney was diagnosed with radiculopathy following her 2014 car accident, making it implausible that her radiculitis was caused by her 2020 fall. She began treatment for headaches as a result of the 2014 accident as well. McKinney received continued treatment for headaches following her 2018 and 2020 hospital admissions, cutting against Dr. Lendener's theory that her headaches were caused by her 2020 fall. Further Dr. Lefkoe found that a comparison of McKinney's records showed that she suffered from degenerative disease in her back, knees, and neck, and that these injuries were not aggravated by her December 2020 fall.

Dr. Lefkoe did testify that McKinney suffered from lumbosacral and cervical sprain and strain as a result of her December 2020 fall, since her fall caused some acute pain to her back and neck. Therefore, the Court will award damages for those injuries.

### c.  Damages

McKinney is entitled to damages for medical costs and pain and suffering. The parties stipulated that McKinney's outstanding medical expenses amount to $7,120, and the Court will award that amount. The Court will also award McKinney $50,000 in damages for pain and suffering for her lumbar and cervical sprain and strain. McKinney testified that her activities of daily life have been greatly impacted since her fall, and she has less ability to take care of family members and pursue her own activities. Although most of her injuries were unrelated to her fall, both medical experts agreed that she suffered lumbar and cervical sprain and strain. Dr. Lendener

testified that her evaluation in October 2021 indicated that those acute conditions had been resolved, and that McKinney's remaining conditions were chronic. Therefore, the Court awards $5,000 per month for the ten months between December 2020 and October 2021 that McKinney suffered from lumbar and cervical sprain and strain, for a total of $50,000 in pain and suffering, and $57,120 in total damages, which will be reduced by McKinney's comparative negligence.

Pennsylvania law provides that damages awards for negligence shall be reduced to account for the plaintiff's negligence. Although USPS is ultimately liable, McKinney exhibited some negligence in persisting in walking on snow in a non-emergency situation instead of returning to her car. Accounting for McKinney's negligence, the Court will reduce McKinney's award by one-third, for a total damage award of $38,080.

## IV.    CONCLUSION

USPS exhibited negligence in failing to create a clear pathway on the sidewalk for its business invitee, McKinney. As a result of USPS's negligence, McKinney slipped and fell, suffering cervical sprain and strain and lumbar sprain and strain. McKinney's other medical conditions are unrelated to her December 2020 fall. McKinney's damages award is reduced by one-third due to her own negligence. A judgment in the total amount of $38,080 is entered in favor of McKinney and against the United States. An appropriate Order will follow.

BY THE COURT:

/s/ Chad F. Kenney

_____

CHAD F. KENNEY, JUDGE